# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs October 1, 2019

## IN RE ADRIAN M.-M., ET AL.

### Appeal from the Chancery Court for Obion County
No. 33512     W. Michael Maloan, Chancellor

---

### No. W2019-00931-COA-R3-PT

---

This appeal concerns termination of parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Chancery Court for Obion County ("the Trial Court") seeking to terminate the parental rights of Emily M. M.-A. ("Mother") to her minor children Adrian, Maribel, Alisiana, and Elena ("the Children").[1] The Children had been exposed to methamphetamine in Mother's care. After trial, the Trial Court entered an order terminating Mother's parental rights to the Children on the grounds of abandonment by failure to provide a suitable home; abandonment by failure to visit; substantial noncompliance with the permanency plan; severe child abuse; and, being sentenced to more than two years' imprisonment for child abuse. The Trial Court also found that termination of Mother's parental rights is in the Children's best interest. On appeal, Mother argues that she has made improvements such that termination of her parental rights is not in the Children's best interest. First, apart from the grounds of failure to visit and failure to provide a suitable home, which we reverse, we affirm the grounds for termination found by the Trial Court. Regarding best interest, we find that Mother has no meaningful relationship with the Children and that her purported improvements are insufficient. The evidence is clear and convincing that termination of Mother's parental rights is in the Children's best interest. We affirm, in part, and, reverse, in part, the judgment of the Trial Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed, in Part, and Reversed, in Part; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S. and KENNY W. ARMSTRONG, J., joined.

---

[1] DCS also sought to terminate the parental rights of Dionisio M.-A., the Children's legal father, and William M., alleged by Mother to be the biological father of Alisiana and Elena. The Trial Court terminated the parental rights of both men. Neither man is a party on appeal. This appeal concerns Mother's parental rights only.

Cristy C. Cooper, Martin, Tennessee, for the appellant, Emily M. M.-A.

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## Background

In February 2017, the Children were removed from Mother's custody on the basis of domestic violence and drug abuse in the home.[2] Mother and the Children tested positive for methamphetamine. Afterwards, Mother was charged with aggravated child abuse. In October 2017, Mother pled guilty to four counts of attempted aggravated child abuse for which she received a sentence of eight years for each count running concurrently. The sentence was suspended, and Mother was placed on supervised probation. In November 2017, the Juvenile Court for Obion County ("the Juvenile Court") found the Children dependent and neglected and victims of severe child abuse. Mother moved to Ohio, and the Children remained in Tennessee with a foster family.

Three permanency plans were fashioned for Mother with her participation over the course of the case. Taken together, Mother's responsibilities under the plans included: pass consecutive drug screens; participate in any classes offered in jail; maintain contact with DCS; update DCS of any changes of contact information within 24 hours; complete a parenting assessment and follow all recommendations; complete a mental health intake and an A & D assessment; and, address domestic violence issues through counseling.

In May 2018, DCS filed a petition in the Trial Court seeking to terminate Mother's parental rights to the Children. DCS alleged multiple grounds for termination: abandonment by failure to provide a suitable home; abandonment by failure to visit; abandonment by failure to support; persistent conditions; substantial noncompliance with the permanency plan; severe child abuse; and, being sentenced to more than two years' imprisonment for child abuse. This case was tried in April 2019. At the beginning of trial, DCS stated that it would not be proceeding with the ground of failure to support.

Two witnesses testified at trial. First to testify was Brian Hill ("Hill"), a family service worker for DCS. Hill was the Children's case manager. Hill testified that the Children were removed from Mother's home in February 2017. Mother and the Children tested positive for methamphetamine. Mother, who was incarcerated from March 31,

---

[2] Adrian was born in February 2010; Maribel in August 2013; Alisiana in September 2015; and, Elena in January 2017.

2017 to May 4, 2017, went into rehab at Buffalo Valley for 28 days. After her time in rehab, Mother moved to Ohio where she has friends and family. Hill testified that it was explained to Mother that her move to Ohio would make DCS's task of assisting her more difficult. Hill, who took over the case in May of 2018, stated that Mother had two different addresses on his watch, and for a period she was out of touch with him. Hill testified that no ICPC home study had been conducted on Mother because she moved so frequently. Regarding visitation, Hill stated that Mother had visited the Children six times for a total of twelve hours in the course of two years. When asked if Mother had completed all of her permanency plan responsibilities, Hill testified: "No, ma'am, because she failed to complete a parenting assessment, she failed to complete mental health intake with the A and D assessment and to address domestic violence and counseling." Regarding DCS's efforts, Hill stated:

Q. What reasonable efforts has the Department provided to the mother from the time of the removal until this termination was filed?
A. Well, the mother entered rehab through our criminal court and since she didn't sign a release, the department was not able to work with her or provide any additional services for the first 28 days. However, since that time, the department has offered to set up parenting. We have attempted to schedule a parenting assessment and pay for it. We have offered to assist in finding housing here in Tennessee, to pay for drug screens, to conduct an ICPC home study on her home in Ohio. We have offered gas cards and hotels for the mother to use to come down and visit the children. We have communicated with service providers in Ohio to explain the services mother needed to complete on the permanency plan. We have offered regular monthly visitation for the mother.
Q. Since the children have been removed from the mother, she has not corrected the situation to make herself a suitable home to care for the children; has she?
A. No, ma'am. Her moving to Ohio directly afterwards impeded her ability to work services with the department.

With respect to the Children's foster family, Hill testified:

Q. Are the children currently in an adoptive placement?
A. They are.
Q. How long have the children been in this adoptive placement?
A. They have been there since coming into custody.
Q. And 2 of the minor children were extremely young when they came into custody, 1 and 1/2 years old, 6 weeks old. So would it be fair to say the foster home is the only home they have known at this point in their lives?

A. Yes, ma'am.

Q. Would it be detrimental to the minor children for there to be a change in placement?

A. Yes, ma'am.

Q. Do the children have a meaningful relationship with their mother?

A. The oldest two children, Adrian and Maribel, I would say they love their mother. They are excited whenever she does come visit with then but I wouldn't characterize it as a meaningful relationship. I would say they are more so bonded with one another and the foster mom.

Q. So you would say the children have a bond with the foster parents?

A. Yes. And the foster family.

Hill concluded his direct examination by testifying that Mother had made no lasting changes to her lifestyle or conduct and that she had failed to demonstrate an ability to provide a safe and stable home for the Children.

On cross-examination, Hill stated it was possible that Mother's case could have been referred to Ohio, but that he never implemented such a referral. Hill testified, however, that "[w]e have worked with the mother and spoken to service providers there in Ohio." Hill could not identify the providers' names but stated that they could be found in the file. Hill stated further that he was unaware of any friends or relatives Mother had in Tennessee. Hill acknowledged that Mother had passed three or four drug screens and attended a rehab program.

Continuing his testimony, when asked if Mother brought any gifts on her visits, Hill stated: "No, ma'am. And the visit that I supervised I had an issue with her being on the phone facetiming." Regarding whether he had ever spoken with Mother about seeking services in Ohio, Hill stated that "she told me on several occasions that she was starting" but "whenever I would ask her the name of where she was going and if she signed paperwork for me to get that information, she was not able to provide that name." Hill testified that on each visit to Tennessee, Mother was provided gas cards and hotel rooms.

Next and last to testify was Mother, who participated by telephone from Ohio. Mother stated that she had successfully completed inpatient rehab at Buffalo Valley and had a follow-up A & D outpatient treatment. Mother testified: "I have been doing the process, I have been receiving A and D, counseling 101, and it is through an organization here in Ohio called Anazo. I have mentioned it many of times to my case worker and I did sign a medical, like a report, through Anazo." Mother stated that she lived with her mother, son, and older brother. Mother testified that her mother's address was always effective as a means of reaching her. When asked if she had provided DCS with proof of

-4-

her A & D, parenting classes, and mental health counseling, Mother stated "[n]o" because "[t]hey don't give me paperwork."

Continuing her testimony, Mother stated that she worked at a factory prior to her pregnancy. Mother testified that she then had a "bowel/intestine rupture" in her stomach, so she cannot sit or travel. Mother stated that she could return to work after her pregnancy. Regarding contact with the Children, Mother stated that she spoke to them by phone at least every Sunday. Mother described her relationship with the Children as "good." Mother testified that traveling from Ohio to Tennessee and back was difficult. Mother stated that she brought the Children gifts, such as shoes, when she visited them.

Concluding her testimony, Mother offered a host of excuses for why she did not complete her services, hold a job for long, maintain a stable residence, or visit the Children more often:

Q. Have you completed any of those services that you state you are working on?
A. No. I still do that.
Q. So for a period of 2 years, you have been working on these services but you haven't completed a single one?
A. Yes, because my probation department said I needed to continue to do that, that's why. There is not a date for completion. I have to continue to do them.
Q. If the department had contacted the facility that you claim that you are receiving these services at and they say you missed 10 scheduled appointments, would that be accurate?
A. Yes.
Q. Why are you missing those appointments?
A. I was in the hospital. I just got out. That is why I am not there. I have been in the hospital, I moved, and you know I started working. Since my kids have been gone, I have had 3 different jobs. So I am working and had to reschedule my appointments because I am trying to work.
Q. Where have you worked in the time period since your children have been removed?
A. I have worked at healthcare, I was working dietary in there and I got fired because -- I had just got hired in there, I wasn't even working like 2 weeks there. Then I had to come to Court in Tennessee. They told me they had to let me go because I had just started. So I ended up leaving there so they didn't fire me. I worked at Autoplex, that is where I was working at when I went to the hospital and had emergency surgery. I got put on - because I had to lift a 70 pound box that was --

Q. Right. Where was your third job?

A. Then I worked at Taco Bell. I worked there for awhile. Then I was working --

Q. So you have had 4 jobs?

A. Yes.

Q. Did you earn minimum wage at all of those jobs?

A. Yes.

Q. And you still could not send any child support for any of your children?

A. No. I could barely provide for myself.

Q. And how long have you been living at the address you are living at now?

A. I have been living here for awhile. I moved in and moved back.

Q. You have actually moved and moved back several times; is that true?

A. Yes.

Q. Why have you been moving in and out of that home?

A. Because it is crowded that is why. I sleep on the sofa, that's why.

Q. So there is really no room for your children in that home; is that correct?

A. Yes, that is correct. There is no room here. I knew that.

Q. In the other homes you have lived in, you weren't able to provide those addresses to the department, were you?

A. Yes, I did.

Q. Are you sure about that?

A. Yes, I did. One was . . . Canton, Ohio, and the other one was Woodville, Ohio. I supplied both of them.

Q. You don't recall telling Mr. Hill on August 28th, 2018 that you had recently moved in with a roommate but you could not recall the address?

A. I gave him the address. He had the address. That would have been the . . . -- they had it - they sent me mail there.

Q. What grades are your children who attend school in?

A. Which children that I have or the ones there?

Q. The four children that we are in Court about today?

A. Adrian is in 2nd and Maribel she goes to pre-school/kindergarten. The other 2 go to daycare.

Q. What about Maribel?

A. Maribel is the one I am talking about. She goes to kindergarten.

Q. What about Adrian?

A. 2nd grade.

Q. Who are their teachers?

A. That I don't know.

Q. What are their grades?

A. I do know Adrian was struggling. They have one working with him. There was a time they were struggling because Adrian was stealing things so they were talking to Adrian about that. Yes.

Q. What are your children's hobbies?

A. These questions were never ever asked until today. There are times I don't get to know everything because Miss [W.] is very busy with them. She has a busy life.

Q. Alright, and you don't get to know everything because you don't bother for the last 2 years -

A. I only get -

Q. You don't know everything about your children because you have only bothered over the course of more than 2 years to come see them for 12 hours. Would that be fair?

A. It is a 10 hour trip there and a 10 hour trip back. Does it look like I have all the money in the world to travel all the time? All you want to say is I don't come see them. You know what, at least I accepted custody more than their father ever did and I saw them all of the time.

MS. SIMPSON: Nothing further, Your Honor.

THE COURT: Anything further, Ms. Cooper?

MS. COOPER: No, Your Honor.

THE COURT: Anything, Ms. Mueller?

MS. MUELLER: No, sir.

[MOTHER]: All they can do is worry about me for 2 years and 12 hours to see them. They want to fight with me about it now.

THE COURT: Alright, ma'am, that is enough. Your testimony is at an end.

In May 2019, the Trial Court entered its final judgment terminating Mother's parental rights. The Trial Court found, by clear and convincing evidence, the grounds of abandonment by failure to provide a suitable home; abandonment by failure to visit; substantial noncompliance with the permanency plan; severe child abuse; and, being sentenced to more than two years' imprisonment for child abuse. The Trial Court found also that termination of Mother's parental rights is in the Children's best interest. In its final judgment, the Trial Court stated, in part:

The minor children were removed from the legal and physical custody of [Mother] on February 22, 2017, after the Department had made reasonable efforts to prevent this removal. Testimony was that the Department originally became involved with this family and filed a Petition for an Order Controlling Conduct and for Protective Supervision, on February 8, 2017, in an attempt to work services with the family to prevent removal of the children. However, Mr. Hill testified that there was no

substantial compliance with these court ordered services prior to the removal of the children a few weeks later. The relevant four month time frame here is from February 23, 2017 until June 23, 2017, which is the first four months after the removal of the children from [Mother's] custody. The evidence presented in this matter show that [Mother] has made no reasonable efforts to provide a suitable home for her minor children during the initial four months after the removal or at any throughout this case. The evidence shows that the mother was incarcerated from March 31, 2017 until May 4, 2017, at which time she was released to attend rehab. After leaving rehab in late May of 2017, she moved immediately to Ohio. Her testimony was that she has moved addresses several times during the course of this case since being in Ohio even, and is currently residing with her mother where there is not enough space for her and her children to reside. She moved from Tennessee to Ohio first around the end of May 2017, according to the testimony provided, despite being advised that this would make working services with the Department more difficult. The Department made reasonable efforts to assist the mother in this matter, including offering parenting classes; attempting to schedule a parenting assessment and pay for this assessment; offering to assist with finding housing in Tennessee if she desired to remain or move back here; offering drug screens; requesting ICPC home studies to be conducted in Ohio; offering gas cards and hotel rooms to the mother for visitation with the children; communicating with service providers in Ohio regarding the services the mother needed to complete on the permanency plan; and explored all relative options provided by the mother in Ohio. The mother did enter into Buffalo Valley for rehab through her criminal charges, but did not sign a release for the Department to communicate or work with her while she was in this rehab program. Testimony provided was that upon leaving the program at Buffalo Valley, the mother returned to Ohio, where she has continuously lived since. The mother's own testimony was that she has not completed any other services either in Tennessee or in Ohio. The mother testified she had begun services in Ohio, but offered several excuses as to why she had not complete these over the last two years. The mother has not, after more than two years, managed to complete the things necessary for her to have a safe and suitable home for these minor children, and therefore it does not appear that she will be able to do so at any time in the near future.

Testimony was presented that the permanency plans created, ratified, and found to be reasonably related to the reasons for the removal in this matter required [Mother] to complete the following action steps: pay child support; have regular scheduled visits that are positive and appropriate;

-8-

pass consecutive drug screens (urine, hair follicle, nail and mouth swab); participate in classes provided by the jail if available; maintain contact with the FSW and update the FSW with any changes in contact information (phone number, address, etc.) within 24 hours of change; complete a parenting assessment and follow all recommendations; complete a mental health intake with an A&D assessment and follow all recommendations; and address domestic violence during counseling. Mr. Hill testified that [Mother] participated by phone in the making of that permanency plan, and that the plan was ratified by the juvenile court. Mr. Hill also testified that while the mother did go to Buffalo Valley for A&D issues, she did not sign a release for the Department to have access to her records there, so compliance could not be monitored. Testimony was that the mother did submit to 3-4 drug screens, but that it was difficult to do random drug screens as the Department could only administer them when the mother came to Tennessee for planned visits. The testimony from Mr. Hill was that the mother has not done the mental health intake, the parenting assessment, nor has she addressed domestic violence issues in counseling. When questioned about what services she had done while in Ohio, the mother testified that though she has worked on some services throughout the time she has been there, she has completed no services over the course of the last two years. The mother presented no evidence as to any services she has enrolled in or completed during the entirety of this case. The mother participated in every permanency plan created in this matter, and was aware of the requirements set forth for her in each plan.

As to the ground of persistent conditions, the children have been in custody for approximately 26 months now, but the mother has lived in Ohio for the majority of that time period. The Department has failed to prove this ground by clear and convincing evidence. There has not been enough evidence presented as to the living conditions of the mother in Ohio for this ground to be satisfied.

The court will address the grounds of severe child abuse and the mother's sentence for child abuse together. The Obion County Juvenile Court found, as the evidence presented shows, that the mother was the perpetrator of severe abuse against the minor children due to all of them failing drug screens for methamphetamine. This has been shown without controversy. Further, the mother pled guilty to four counts of attempted aggravated child abuse in the Obion County Circuit Court, and was sentenced to 8 years, to be served on supervised probation, for each count. All four certified judgments were entered without objection, and these judgments show that the mother was indeed sentenced to a period of 2

-9-

years of greater for a child abuse charge. This is uncontested as a ground against the mother, [Mother].

The final ground alleged against [Mother] is the ground of abandonment-failure to visit. It was established in testimony that these children have been in custody since February 22, 2017, which is approximately 26 months as of this hearing date. The Department has offered the mother gas cards for transportation, as well as hotel accommodations when she came to visit. Despite this offer, the testimony was uncontroverted that the mother has only exercised 12 hours of visitation over the course of the 26 month period the children have been in custody. There was testimony that the mother has had phone calls with the minor children throughout the case, but the Court finds that this is not substantial contact with the minor children due to their ages. This contact was token at best, if even that. The mother acknowledged that she had not visited more than what the Department testified to—the 12 hours over the course of the case—and offered no explanation for why she did not other than some medical issues she had recently had and her mother's inability to bring her. [Mother] took no personal responsibility for not visiting more with her minor children.

The Court concludes, based upon evidence set forth above, that there is clear and convincing evidence to support grounds for termination of the Respondent, [Mother's], parental rights under T.C.A. §36-1-113(g).

***

The evidence presented shows by clear and convincing evidence that the mother has not consistently worked services with the Department to address any of the issues or concerns identified as reasons the children were initially removed from her. The mother has had 26 months to work services, and testified herself she had never completed the mental health services, the parenting services, the parenting assessment, and had not established a safe and stable home for her and the children. The mother did attend Buffalo Valley for her alcohol and drug issues, but never signed a release for the Department to see what she completed and did there. The mother has passed drug screens that the Department could give her, but these were in the mother's control as they could only be given when she appeared in Tennessee.

Testimony was provided that the Department did provide reasonable efforts to the mother to assist with making lasting changes in her lifestyle and conduct, as set forth in the findings for the grounds above. The Department even testified that they explained on several occasions to the

-10-

mother the difficulty her relocating to Ohio would create in providing services to her.

The testimony was unrefuted that changing caregivers at this stage of their lives would have a detrimental effect on the minor children, as they are extremely bonded to the foster family, and have a warm loving relationship with the foster mother. The minor children have no meaningful relationship with [Mother]. When she was questioned about the children, she could not identify their teachers and could not identify what their hobbies were. [Mother] has not made an effort to know her children and have a relationship with them since they were removed on February 22, 2017. It would be extremely detrimental to move them from the foster home that wishes to adopt them, and the home where they are all placed together. The foster family wishes to adopt the minor children, and to remove them from this safe and loving home at this point in their life would be harmful to their well-being. The foster mother is the only parent the youngest two minor children have ever really known, after being placed there for approximately 2 years.

[Mother] has shown little or no interest in the welfare of the minor children, and she has failed to maintain any type of consistent contact with the minor children. [Mother] chose to put her own welfare and interests above those of her minor children, as she almost immediately moved to Ohio once her criminal issues here were resolved. The children had no relatives left in Tennessee when the mother moved to Ohio. Though the Department offered regular visitation to [Mother], including offering to provide assistance with transportation expenses and with a hotel room, [Mother] rarely took the Department up on this offer.

The Court does not have enough information about the mother's current living environment to know if it would be safe and healthy for the minor children or whether there is illegal activity or drug/alcohol use in the home, and therefore, this factor weighs neither for or against the best interests analysis.

The mother has not participated in the mental health services recommended by the Department, nor has she submitted to the parenting assessment requested by the Department; therefore, the Court cannot determine at this time if the mother's mental or emotional state would be detrimental to the children or determine if she could provide safe and stable care and supervision for the minor children.

Based on the foregoing, the Court concludes by clear and convincing evidence that termination as to Respondent, [Mother], is in the minor children's best interests.

Mother timely appealed to this Court.

## Discussion

Although not stated exactly as such, Mother raises the following single issue on appeal: whether the Trial Court erred by finding that termination of her parental rights is in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id.* If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

---

[5] Tenn. Code Ann. § 36-1-113(i).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Mother has not challenged any of the grounds for termination found against her. Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). As such, we review each of the grounds for termination.

Five grounds for termination of parental rights were found against Mother, consisting of the following:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or

omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;

\*\*\*

(4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian;

(5) The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian;

Tenn. Code Ann. § 36-1-113(g)(1)-(2), (4)-(5) (2017).[6]

As to abandonment, the Trial Court found that two forms—failure to visit and failure to provide a suitable home—were proven:

---

[6] We apply the parental rights termination statutes as they existed on May 23, 2018 when DCS filed its petition.

-16-

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

(ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102 (1)(A)(i)-(ii) (2017).

As an initial matter, DCS concedes the ground of abandonment by failure to visit. Based on our review of the record, we agree that the evidence for this ground, while some exists, does not rise to the level of clear and convincing. In light of DCS's concession and our own review of the record, we reverse the ground of abandonment by failure to visit.

-17-

Regarding the ground of failure to provide a suitable home, the Children were removed from Mother's home on February 22, 2017 and later adjudicated dependent and neglected. The relevant four month time-frame for this ground is February 23, 2017 until June 22, 2017. Mother was incarcerated for part of this period, from March 31, 2017 until May 4, 2017. In late May 2017, Mother moved to Ohio, complicating DCS's efforts to assist her. The Trial Court found that DCS made reasonable efforts to assist Mother. However, the findings made by the Trial Court do not, in our judgment, track specifically enough to DCS's efforts in the relevant four months. Certainly, Mother has not been diligent in preparing a suitable home for the Children at any point, but we cannot just ignore the statutory period for examining DCS's efforts. We also are mindful that Mother was incarcerated during part of that period, naturally hindering her ability to provide a suitable home. Given these facts, we find that the evidence does not rise to the level of clear and convincing necessary to prove this ground. We reverse the ground of failure to provide a suitable home.

The next ground we review is that of substantial noncompliance with the statement of responsibilities in the permanency plans. Mother took part in rehab and passed certain drug screens. However, as found by the Trial Court and testified to by Hill, Mother failed to complete mental health services, the parenting assessment, or address domestic violence issues in counseling. The responsibilities contained in the permanency plans were reasonably related to the conditions necessitating the Children's removal from Mother's home, namely drug abuse and domestic violence. Mother's failure to adhere to her responsibilities under the permanency plans in these crucial respects represents substantial noncompliance. The evidence does not preponderate against the Trial Court's findings relative to this issue. We further have no basis to disturb the Trial Court's implicit credibility determinations. We find, as did the Trial Court, that the ground of substantial noncompliance was proven by clear and convincing evidence.

Another ground found against Mother was that of severe child abuse. In November 2017, the Juvenile Court entered an order finding the Children dependent and neglected and victims of severe child abuse perpetrated by Mother, stating as pertinent:

[T[here is clear and convincing evidence that the minor children are dependent and neglected and victims of severe abuse pursuant to TCA 39-15-401(b) and (c)(1), 39-15-402(a)(2) and 37-1-102(b)(22)(C) based upon the mother and the minor children all testing positive for methamphetamine and based upon the mother being charged with aggravated child abuse and neglect under TCA 39-15-402.

Under Tenn. Code Ann. § 36-1-113(g)(4), this prior order finding severe child abuse constitutes a ground for termination of parental rights. Mother has raised no argument as

to the finality or validity of the order. Indeed, Mother has not contested any ground at all. We find, as did the Trial Court, that the ground of severe child abuse was proven by clear and convincing evidence.

The fifth and final ground for termination we review is that of being sentenced to more than two years' imprisonment for child abuse. Mother pled guilty to four counts of attempted aggravated child abuse, a class B felony, and received eight years of supervised probation for each count to be served concurrently. The record contains copies of the convictions. The crime for which Mother was convicted, attempted aggravated child abuse at Tenn. Code Ann. § 39-15-402, falls within the definition of severe child abuse at Tenn. Code Ann. § 37-1-102 as required by the applicable ground for termination of parental rights, Tenn. Code Ann § 36-1-113(g)(5). *See In re Kason C.*, No. M2013-02624-COA-R3-PT, 2014 WL 2768003, at *4 (Tenn. Ct. App. June 17, 2014), *no appl. perm. appeal filed*. We find, as did the Trial Court, that the ground of being sentenced to more than two years' imprisonment for child abuse was proven by clear and convincing evidence.

The final issue we address is whether the Trial Court erred by finding that termination of Mother's parental rights is in the Children's best interest. When at least one ground is proven, courts then consider a number of statutory factors in determining whether termination of parental rights is in a child's best interest:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

-19-

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2017).

Mother argues that it is not in the Children's best interest for her parental rights to be terminated. In support of her position, Mother points to Hill's testimony that the two older children love her. Mother asserts that she visited the Children when she was financially and physically able to do so. Mother states further that she always maintained telephone communication with the Children. As to her move to Ohio, Mother states that she effectively had no choice as that is where her system support is and she would be homeless if she had remained in Tennessee.

Respectfully, Mother's argument is unavailing. The few positives put forward by Mother pale in comparison to the negatives as regards preserving her parental rights. While Mother points to Hill's testimony about the older children loving her, she omits what Hill stated next when he testified that "[t]hey are excited whenever she does come visit with then but I wouldn't characterize it as a meaningful relationship. I would say they are more so bonded with one another and the foster mom." Mother's testimony bears out this assessment. When asked questions about details of the Children's lives at trial, Mother became defensive, and it is evident that she is a remote figure to them.

-20-

To the extent Mother took some positive steps, such as going to rehab, she is to be commended but it is not enough. The Trial Court made detailed findings as to the Children's best interest, including:

The mother has had 26 months to work services, and testified herself she had never completed the mental health services, the parenting services, the parenting assessment, and had not established a safe and stable home for her and the children. The mother did attend Buffalo Valley for her alcohol and drug issues, but never signed a release for the Department to see what she completed and did there. The mother has passed drug screens that the Department could give her, but these were in the mother's control as they could only be given when she appeared in Tennessee.

In view of these findings, which the evidence does not preponderate against, Mother's efforts at effecting lasting change were half-hearted and insufficient. The Children were removed from Mother's home because they were exposed to methamphetamine and domestic violence. Mother has pled guilty to attempted aggravated child abuse involving the Children. It was incumbent upon Mother to make significant changes to rectify the dangerous conditions in her life, dangers that impacted the Children in a serious way, to help ensure that those conditions would not resurface. Mother has not done so, despite DCS's efforts to assist. Mother has paid no child support. She has minimally visited with the Children in person. Instead, she has offered excuses, which the Trial Court clearly did not credit. Meanwhile, the evidence is uncontroverted that the Children are in a suitable foster home. Prolonging the Children's limbo is not in their best interest when, after two years, Mother still has not made demonstrable, lasting change.

The evidence does not preponderate against the Trial Court's detailed factual findings relative to the Children's best interest, in consideration of each of the statutory factors. We find by clear and convincing evidence, as did the Trial Court, that termination of Mother's parental rights is in the Children's best interest. Apart from the grounds of abandonment for failure to visit and failure to provide a suitable home, which we reverse, we affirm the judgment of the Trial Court terminating Mother's parental rights to the Children.

## Conclusion

The judgment of the Trial Court is affirmed, in part, and reversed, in part, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Emily M. M.-A., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE